James D. and Pamela S. BREWER,
Appellants–Defendants,

v.

EMC MORTGAGE CORP.,
Appellee–Plaintiff.

No. 29A04–0006–CV–228.

Court of Appeals of Indiana.

Jan. 26, 2001.

Rehearing Denied April 9, 2001.

Marvin E. Coffey, Robinson & Heck, Indianapolis, IN, Attorney for Appellant.

James P. Moloy, Dann Pecar Newman & Kleiman, P.C., Indianapolis, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge

James and Pamela Brewer appeal the trial court's award of tax-sale surplus funds to EMC Mortgage Corp. They raise multiple issues, which we reduce to one dispositive issue: Whether the trial court erred in awarding EMC tax-surplus funds from the tax sale of the Brewer residence.

We affirm.

### Facts and Procedural History

In February of 1996, the Brewers obtained a mortgage from Cityscape Mortgage Corp., to purchase a residence in Noblesville, Indiana. In September of 1997, after the Brewers had failed to make several mortgage payments, Cityscape notified the Brewers of their default and filed a foreclosure action in the Hamilton Superior Court.

On October 13, 1997, apparently unknown to the Brewers, Cityscape, and the trial court, the property was sold at a tax sale to a third party, resulting in a tax-sale surplus of more than $62,000, which surplus is at issue herein. Upon payment of the tax deficiency, the surplus was paid directly into an escrow account with the

Hamilton County Auditor's Office pursuant to Indiana statute.[1]

While still unaware of the October 1997 tax sale, Cityscape assigned its interest in the property and foreclosure action to Wilshire Funding on January 21, 1998. On March 17, 1998, the trial court entered a default judgment for Wilshire. On March 23, 1998, the trial court entered summary judgment for Wilshire against the Brewers and ordered in its findings of fact and conclusions of law:

> That the mortgage of Plaintiff be, and it hereby is foreclosed as a first and prior lien and the equity or redemption of the Brewers, and any persons who might have some possible interest in the real estate described herein, and all persons claiming under and through them are hereby foreclosed, and the Brewers are forever barred from asserting any right, title or interest in the ... property ... [c]ommonly known as 18395 Pennington Road, Noblesville, Indiana, 46060.

R. at 65. The foreclosure judgment was for $90,360, plus interest and expenses.

The Hamilton County Clerk promptly certified the trial court's foreclosure order to the Hamilton County Sheriff and, on June 1, 1998, shortly before the scheduled sheriff's sale in foreclosure, the Brewers filed for Chapter 13 bankruptcy. On their Schedule of Creditors Holding Secured Claims the Brewers listed an auto loan and the mortgage on the property. They valued the mortgage at $95,000 and the claim amount at $83,163.72. R. at 72.[2] The Brewers eventually converted to Chapter 7 liquidation and were discharged from personal liability on January 17, 1999. The bankruptcy estate was closed on August 24, 1999.

1. Indiana Code § 6–1.1–24–7 (1998).

2. The Hamilton County Auditor's Office maintained a "Delinquent Tax Sale Transaction Record" with regard to the tax sale of the property. Handwritten notations on the record indicate that the Brewers as well as Wil-

shire inquired into the redemption of the property at least as early as May of 1998. In fact, an entry of May 29, 1998, merely three days before the Brewers filed for bankruptcy, shows that "Mr. Brewer came in and figured redemption for 6/15/98." R. at 169.

On November 9, 1999, Wilshire assigned its interest in the Brewer mortgage foreclosure judgment to EMC Mortgage Corp., and EMC filed a motion for in-rem proceeding supplemental with the trial court. The trial court issued its order regarding EMC's motion on April 24, 2000, granting EMC the tax-sale surplus funds held in escrow with the Hamilton County Auditor. The Brewers appeal.

### I. Tax–Sale Surplus Funds

■ At the outset, we note that the bankruptcy court has exclusive jurisdiction over the bankruptcy issues in this case, as it is neither this court's purpose nor its function to construe United States bankruptcy laws. *See Holiday v. Kinslow*, 659 N.E.2d 647, 649 (Ind.Ct.App.1995). When the bankruptcy court addresses a specific issue bearing on a state claim, we will adhere to the bankruptcy court's finding unless doing so would compromise Indiana's legal framework. *Id.*

The tax-sale surplus funds became part of the Brewers' bankruptcy estate. The relevant sections of the Code read as follows:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) ... all legal or equitable interest of the debtor in property as of the commencement of the case.

. . .

(6) *Proceeds*, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

11 U.S.C. 541(a) (1994) (emphasis added). The Brewers' retained a legal interest in the property at the time they petitioned for bankruptcy, albeit only a redemption interest, because the tax-sale deed had not yet been issued and the foreclosure proceedings had been stayed. As a result of the bankruptcy stay, the property remained in the Brewers' name and, under Section 541(a)(1), the Brewers' residence became part of their bankruptcy estate. Consequently, pursuant to subsection six, the proceeds of the tax sale, which were paid directly into an escrow account with the auditor's office, were also part of the Brewers' bankruptcy estate.

■ Although the original foreclosure judgment issued by the trial court included a personal judgment against the Brewers for any deficiency in the balance owed to the mortgage company and the amount paid for the property when it was sold, the order of discharge from bankruptcy eliminated any personal liability beyond the creditor's secured interest in the property. So, while EMC was precluded from pursuing the Brewers personally for any deficiency in the sale price of the property, its claim to the proceeds of the tax-sale was not nullified by the Brewers' discharge from bankruptcy.

■ While the bankruptcy was still pending, on December 22, 1998, the bankruptcy court ordered the property abandoned to EMC so that EMC could foreclose.[3] The bankruptcy court's order permitted the Brewers to sell the property prior to a sheriff's sale in foreclosure "so long as such sale will pay in full the claim of EMC Mortgage Corporation prior to the sheriff's sale." R. at 175. The bankruptcy court's order is quite clear that EMC's claim remained valid subsequent to the abandonment of the property. However, by the time the property had been abandoned in bankruptcy, the tax deed had issued to the tax sale purchasers, leaving only the sale proceeds in the tax-surplus fund in the bankruptcy

---

**3.** On February 8, 1999, the bankruptcy court likewise granted the bankruptcy trustee's request to abandon the property.

estate. It is therefore these proceeds that the trustee abandoned.

Indiana Code section 6–1.1–24–7 governs the distribution of tax sale surplus funds. Subsection (b) provides that:

The:

(1) owner of record who is divested of the owner's property by the issuance of a tax deed to the tax sale purchaser;

(2) tax sale purchaser or purchaser's assignee, upon redemption of the tract or item of real property; or

(3) person with a substantial property interest of public record, as defined in section 1.9 of this chapter and as evidenced by the issuance of a tax deed to a tax sale purchaser, in a county:

(A) having a population of more than two hundred thousand (200,000) but less than four hundred thousand (400,000);

(B) having a consolidated city; or

(C) in which the county auditor and the county treasurer have an agreement under IC 6–1.1–25–4.7;

may file a verified claim for money which is deposited in the tax sale surplus fund. If the claim is approved by the county auditor and the county treasurer, the county auditor shall issue a warrant to a person described in subdivisions (1) through (3) for the amount due.

Ind.Code § 6–1.1–24–7(b). The Brewers rely on this statute to refute EMC's claim in proceeding supplemental to the funds.

## II. Proceeding Supplemental

▪ The issue at hand arises from EMC's in-rem supplemental proceeding against the tax-sale surplus held in escrow with the auditor's office. Such garnishment would be the limit of the Brewers' liability on the underlying mortgage and foreclosure due to the bankruptcy.

▪ The trial court is vested with broad discretion in conducting proceedings supplemental. *Hermitage Ins. Co. v. Salts*, 698 N.E.2d 856, 858 (Ind.Ct.App. 1998). A proceeding supplemental is not an independent action, but is merely a proceeding to enforce an earlier judgment. *Id.* Consequently, proceedings supplemental are conducted in the same court that entered judgment against the defendant, under the same cause number. *Id.* A proceeding supplemental speaks only to how the judgment is to be satisfied, whereas the original action speaks to whether the claim should be satisfied. *Id.*

The Brewers argue that even if the surplus funds are proceeds of the sale of the property, Indiana law prevents EMC from collecting the money, because the relevant statute applies only to surplus funds held in Indiana counties meeting the specifications of subsections (A) through (C). We disagree.

The bankruptcy court order makes clear that, although the Brewers may be the "owner of record" of the property, their ownership is subject to EMC's mortgage, which, by the time of the proceeding supplemental, had a balance exceeding $100,000 in principal, interest, and fees. In addition, EMC most certainly qualifies as a "person with a substantial property interest of public record," as defined in Indiana Code sections 6–1.1–1–1, 6–1.1–1–11, and 6–1.1–24–1.9. The procedure set forth in section 6–1.1–24–7(b)(3) by which persons with a "substantial property interest of record" *may* file such a claim for funds in counties specified in (A) through (C) is precisely that: the procedure for obtaining surplus funds in *those specific counties*. This provision in no way prohibits persons in other counties with substantial property interests of public record from obtaining tax-sale surplus funds held in those counties. Our state constitution's privileges and immunities clause (Article I, Section 23) along with a mountain of case law would prevent such disparate treatment of the holders of property interests.

*See Collins v. Day,* 644 N.E.2d 72 (Ind. 1994).

Instead, the statute provides direction on how persons with substantial property interests *may* file a verified claim in any of our state's five largest counties so that the already heavily congested courts in those counties may be relieved of devoting large amounts of time to essentially administrative real estate matters. The fact that the language, "*may* file a verified claim," is permissive and not mandatory further illustrates that the statute's drafters did not intend for it to be exclusive of other, smaller counties. Ind.Code § 6–1.1–24–7(b)(3)(1998) (emphasis added). The statute merely indicates that qualifying persons in the larger counties have an alternative method of obtaining the surplus funds other than by petition to a trial court. Nothing in the statute *prohibits* such persons from filing their claim with the trial court.

For all of these reasons, we hold that EMC properly petitioned the trial court through its proceeding supplemental for the tax-sale surplus funds and that the trial court committed no error in awarding said funds to EMC.

Affirmed.

MATTINGLY, J., and ROBB, J., concur.